UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA,               :
                                        :
            v.                          :    Case No. S14 12 Cr. 171 (JPO)
                                        :
VLADIMIR GRINBERG,                      :
                                        :
            Defendant.                  :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT VLADIMIR GRINBERG'S SENTENCING MEMORANDUM**

Glen G. McGorty
Shamiso Maswoswe
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 895-4246

*Attorneys for Mr. Grinberg*

## <u>TABLE OF CONTENTS</u>

I.     Introduction ................................................................................................ 1

II.    Background ................................................................................................ 4

    A.    Personal History ................................................................................ 4

        1.    Early Life in the Soviet Union ................................................ 4

        2.    Living in the United States ...................................................... 6

        3.    Mr. Grinberg's Significant Family Responsibilities ................. 6

        4.    Mr. Grinberg Creates His Own Family ................................... 8

        5.    U.S. Citizenship ...................................................................... 9

    B.    Professional Background .................................................................. 10

        1.    Getting His Start in Mental Health Services in the United States ........... 10

        2.    Mr. Grinberg Enters Private Practice ...................................... 11

        3.    Mr. Grinberg's Business Model .............................................. 13

III.    The Prosecution and Guilty Plea ............................................................... 16

IV.    Sentencing ................................................................................................ 18

    A.    Overview of Sentencing Factors ...................................................... 18

    B.    The Section 3553(a) Factors ............................................................ 20

        1.    Nature and Circumstances of the Offense ............................... 20

        2.    Avoiding Unwarranted Sentencing Disparities ....................... 22

            a)    The Spectrum of Culpability ....................................... 23

            b)    Breach of Trust and Oaths ........................................... 25

            c)    Mental Health Treatment vs. Physical Treatment .......... 26

            d)    Not All "Modality Controllers" Are The Same ............. 27

            e)    Personal Profiting from Fraud ...................................... 30

            f)    The Engine of Fraud: the Referring Attorney ............... 32

3.    United States Sentencing Guidelines ................................................ 33

    a)    The Loss Amount .................................................................. 34

    b)    Number of Victims ............................................................... 35

    c)    Sophisticated Means ............................................................. 36

    d)    Criminal History Category ................................................... 37

    e)    Conclusion ............................................................................ 37

4.    History and Characteristics of the Defendant ............................... 37

5.    Purposes of Sentencing ................................................................. 45

    a)    Seriousness of the Offense, Respect for Law, Just Punishment ............................................................................ 45

    b)    Deterrence ............................................................................. 46

    c)    Protection of the Public ........................................................ 47

    d)    Correctional Treatment ........................................................ 47

    e)    Need to Provide Restitution ................................................. 47

V.    Conclusion ............................................................................................. 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall* v. *United States*,
552 U.S. 38 (2007)............................................................................18

*Kimbrough* v. *United States*,
552 U.S. 85 (2007)............................................................................18

*Nelson v. United States*,
555 U.S. 350 (2009) (per curiam)......................................................18

*Rita* v. *United States*,
551 U.S. 338 (2007)..........................................................................18

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR) .............................19, 34

*United States* v. *Booker*,
543 U.S. 220 (2005).....................................................................17, 37

*United States* v. *Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012)...............................................34

*United States v. Menyweather*,
447 F.3d 625 (9th Cir. 2006) ............................................................46

*United States v. Roper*,
462 F.3d 336 (4th Cir. 2006) ............................................................46

**Statutes**

18 U.S.C. § 1956(h)......................................................................................17

18 U.S.C. § 3553(a) ................................................................................*passim*

U.S.S.G. § 1B1.1..........................................................................................37

U.S.S.G. § 2B1.1......................................................................................16-17

U.S.S.G. §§ 3E1.1(a) and (b).......................................................................17

Defendant Vladimir Grinberg, through his counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following his guilty plea to conspiracy to commit health care fraud in violation of Title 18, United States Code, Sections 1347 and 1349, and conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).  The factors set forth in Title 18, United States Code, Section 3553(a), when taken together, mandate that Mr. Grinberg receive a sentence significantly below the stipulated Sentencing Guidelines range.

## I.     Introduction

For as long as Vladimir Grinberg can remember, he has always been passionate about psychology.  As a child, his mother suffered from depression.  When he was a very young adult, his father tried to take his own life.  But, due to issues of access and shame, neither ever sought professional help for their mental health issues.  Mr. Grinberg wanted to change that and embarked on a career designed to expand access to mental health services and to de-stigmatize these issues.  He earned a degree in psychology from Kiev University in Russia and sought to grow the field by teaching psychology at a local teacher's college in Odessa, Ukraine.

When Mr. Grinberg immigrated to the United States in 1990, however, he was unable to secure a job in psychology.  So he looked up his one-time professor, an American psychologist who once taught him in Russia, and volunteered to work for the psychologist for no pay – just so he could learn.  Mr. Grinberg soon developed a relationship with a non-profit mental health provider which, recognizing Mr. Grinberg's commitment to the field, awarded him a scholarship to further his studies.  Mr. Grinberg then graduated with a master's degree in social work from Adelphi University in or about 1994, becoming the first member of his family to secure a college degree from an American university.  By about 1997, Mr. Grinberg began a hotline designed to

1

provide Russian language mental health services to families.  Unfortunately, however, Mr.
Grinberg never became credentialed in psychology in the United States.  So instead, Mr.
Grinberg began partnering with respected psychologists to provide access to both psychological
and social work services.

Mr. Grinberg is before the Court today because his efforts to carry out his life's goal led
him to the no fault insurance system, and the opportunity to commit the serious crimes for which
he has taken full responsibility.  Mr. Grinberg owned and operated a company responsible for
providing mental health care services to patients at a variety of clinics, including three no fault
insurance clinics central to this prosecution (the "No Fault Clinics").  The indictment refers to
individuals such as Mr. Grinberg as "Modality Clinic Controllers," and his business, a "Modality
Clinic."  As discussed herein, however, Mr. Grinberg's conduct was quite different from many of
his co-defendants for reasons that include the following:

- Mr. Grinberg at no time was responsible for owning and operating a no fault insurance clinic.  Rather, he provided patients at no fault insurance clinics with access to mental health professionals.

- Mr. Grinberg, though not a psychologist, was a lifelong mental health professional and a licensed master social worker.

- Mr. Grinberg's latest partner, Dr. John Braun, was a trained psychologist with whom Mr. Grinberg has worked for approximately ten years.  Dr. Braun worked his way up through the ranks, beginning first as an employee and eventually becoming a partner.

- Mr. Grinberg's involvement in his companies was at all times open and notorious and at no point, as a substantive matter, was Mr. Grinberg's involvement in his companies concealed.

The conduct that forms the basis of Mr. Grinberg's plea was effectively twofold.  First,
Mr. Grinberg knowingly paid the controllers of three clinics (the "No Fault Clinic Controllers")
kickbacks in the form of "rent" payments transmitted, on occasion, in the form of a blank check
or payment to a third party as directed by the No Fault Clinic Controllers.  In exchange for these

payments Mr. Grinberg was able to secure office hours for his mental health practitioners and obtain access to patients.  However, in transmitting the payments in this manner, Mr. Grinberg permitted the No Fault Clinic Controllers to launder these criminal proceeds to better conceal and promote the unlawful activity.  Second, Mr. Grinberg was responsible for submitting claims for insurance reimbursement for the testing and treatment administered by his mental health practitioners and, with respect to some claims at some of the three No Fault Clinics, submitted requests for treatment which were not medically necessary.

Mr. Grinberg has accepted full responsibility for his criminal conduct by pleading guilty. Nonetheless, the Guidelines calculation, though stipulated to by the parties, dramatically overstates the appropriate sentence for Mr. Grinberg.  For the myriad reasons contained herein, he was less culpable than the No Fault Clinic Controllers (who have been charged with racketeering offenses), less culpable than the individuals who participated in the business of fraudulently incorporating clinics including those who sold their medical licenses to the highest bidder, and on par or even less culpable than the health care providers who directly administered the fraudulent treatment and violated their sworn oaths and the patients' trust.  With respect to this scheme, Mr. Grinberg was a paper pusher who submitted fraudulent insurance claims and paid kickbacks to get his mental health professionals access to patients, and for that, he has nothing but deep regret and genuine contrition.

Mr. Grinberg's history, including his role as father to two young children, personal characteristics, low chance of recidivism, limited role in the offense, as well as the other factors set forth in 18 U.S.C. § 3553(a), all support a significant downward variance.  The defense respectfully submits that, for Mr. Grinberg, a sentence significantly below the Guidelines range is sufficient, but not greater than necessary, and would meet the purposes of sentencing.

## II.    Background

Mr. Grinberg's history is a story of overcoming adversity and prejudice, of succeeding by hard work and commitment to responsibility, and above all else, of the care of his family and loved ones.[1]

### A.    Personal History

#### 1.    Early Life in the Soviet Union

Mr. Grinberg was born on July 5, 1966, in Odessa in the Ukraine.  One of two children to Mark Grinberg and Slava Dozortzeva Grinberg, Mr. Grinberg grew up in a Jewish family in the then-Soviet Union.  Social circumstances as they were in the Communist nation, no one in his family's strata was either wealthy or impoverished, but rather simply surviving and getting by. Mr. Grinberg was very close with both his parents and his sister Galina, who was ten years his senior.

When Mr. Grinberg was ten years old, his sister Galina gave birth to a son, Vitaliy Vaserman.  As Vitaliy recounts, Mr. Grinberg "has been taking care of me since the day I was born."  (Letter of V. Vaserman, Ex. I).  He was Vitaliy's "father when [his] real one was not around."  (Letter of V. Vaserman, Ex. I).  And when Galina had a second son, Steven, five years later, Mr. Grinberg assumed a similar role.  (Letter of S. Vaserman, Ex. H).  Mr. Grinberg cared for his nephews while the family lived in the Soviet Union, as his sister and her husband often would leave for job opportunities for months at a time.  Except for summers with their parents, his nephews lived with Mr. Grinberg under his care.  Even as he was only a child himself, Mr.

---

[1]    The PSR contains an overview of Mr. Grinberg's history and personal characteristics.  (*See* PSR ¶¶ 80 *et seq*).  The defense has also submitted numerous character and support letters that provide the Court with important information and insight about Mr. Grinberg.  (*See* Letters of Support at Ex. A-O.) The defense understands and appreciates that the Court will take the time to review these letters.

Grinberg was responsible for these young men and to this day "he considers them like his own children." (Letter of S. Gluzberg, Ex. B).

After attending school in Odessa and Kiev, where he earned the equivalent of an undergraduate degree in psychology, Mr. Grinberg worked at a teaching college, instructing school teachers in psychology. Mr. Grinberg also took a six-month post-graduate course at the St. Petersburg Bekhterev Psychoneurological Research Institute, Russia's oldest scientific institute in the field of mental health.

Mr. Grinberg also spent a mandatory two years in the Soviet army, where he was a "private" (or its equivalent) and worked primarily on engineering projects.

Mr. Grinberg and his family endured significant discrimination in the Soviet Union during this period based on their Jewish faith. Mr. Grinberg remembers how his family faced limited economic opportunities because of his background, and in particular, recalls how both his father, a bright and otherwise successful businessman, and his mother, a hard-working engineer, both were discriminated against at work and denied career advancement. Mr. Grinberg's family tried to leave Russia, from at least as early as 1978, when his aunt and their family were granted permission to immigrate to the United States, but Mr. Grinberg's family was denied entry at that time. (Letter of S. Gluzberg, Ex. B).

Likely as a result of these hardships, Mr. Grinberg's mother suffered from depression. Mr. Grinberg's father similarly had mental health issues and in or about 1987, he overdosed on a bottle of pills after having been run out of business and unemployed for over a year. Eventually, his family was able to recover from that near-tragedy and in or about 1990 they immigrated to the United States as Jewish refugees.

5

### 2.      Living in the United States

When Mr. Grinberg first arrived in this country his entire family of six to seven people lived in a one-bedroom apartment.  (Letter of S. Gluzberg, Ex. B; Letter of S. Vasserman, Ex. H).  Mr. Grinberg immediately got to work.  "Instead of using welfare, he was working as a construction and warehouse worker during [the] day, going to the college in the evenings, and washing dishes and serving tables at the restaurant at nights."  (Letter of I. Kim, Ex. D).

Mr. Grinberg's commitment to and support of his nephews continued.  As his nephew recalls, their father "chose not to join or support us.  We were forced to make this huge change without him.  Even though my uncle, Vladimir, is my mom's younger brother by 10 years, he courageously stood up to the challenge and became the support we desperately needed, both financially and emotionally."  (Letter of S. Vaserman, Ex. H).  But Mr. Grinberg did not limit his support to what was "desperately needed."  Steven explained that "[a]lthough my uncle stressed the importance of working hard and earning what you make, he also understood the simple desires of a young boy in a new country. He bought me my first bike with his hard-earned money.  My uncle has always been a family man, generous, and kind."  (Letter of S. Vaserman, Ex. H).  Indeed, when Mr. Grinberg's sister moved to Chicago for a job opportunity, her eldest son remained behind in Mr. Grinberg's care while the son finished high school.

### 3.      Mr. Grinberg's Significant Family Responsibilities

Despite a blossoming career in the mental health field, much of Mr. Grinberg's first decade in the United States focused on giving much-needed care to his family.  Mr. Grinberg's father suffered a stroke in or about 1994, as he continued his struggle with lifelong diabetes.  His mother initially took care of his father after the stroke, but she was abruptly diagnosed with lymphoma soon thereafter and herself needed extensive care.

As a result, Mr. Grinberg found himself caring for his nephew as well as both of his infirmed parents.  During this period, Mr. Grinberg moved his father in to live with him, but it proved impossible to give him the care he needed.  Mr. Grinberg was forced to move his ailing father to a nursing home facility.  He found a facility next door to his office so he was able to keep vigilant watch over his father, visiting him two to three times a day.  His mother remained in their residence, which was located nearby, and Mr. Grinberg cared for her as well.  As his sister Galina described:

> He was very supportive of our parents.  When mom got sick (she had the lymph cancer), Vladimir left behind his business, work, office and went with our mom to the other state for the course of alternative medicine because we hoped it may help. Looking back I understand that it was a great sacrifice on his part but he did it and I [did] not.  Vladimir visited our father at the Nursing home every day till last day of our father life."

(Letter of G. Vaserman, Ex. G).  Everyone in Mr. Grinberg's life bore witness to how he toiled for his sick parents.  His brother-in-law Ralph Ogulnik described Mr. Grinberg as "a great son -- I watched him for years singlehandedly (his sister – my wife - lives in Chicago) taking care of his sick parents on [a] daily basis."  (Letter of R. Ogulnik, Ex. E).  Vitaliy, Mr. Grinberg's nephew, recalled: "I saw firsthand how Vladimir sacrificed himself for his parents.  I saw him feed his ailing mother and change and clean his sick father.  Those were very hard times for our family and especially for Vladimir who became an orphan before he was forty."  (Letter of V. Vaserman, Ex. I).  Similarly, Irina Kim, Mr. Grinberg's girlfriend at the time and the mother of his daughter, recalled that Mr. Grinberg would take his mother to frequent chemotherapy appointments at Memorial Sloan Kettering and "he was frantically searching for new remedies and methods that could help save her life."  (Letter of I. Kim, Ex. D)  He eventually traveled with her to the Berkshires for an extended stay at an alternative medicine retreat for late-stage cancer patients.  This trip resulted in a life change for Mr. Grinberg's mother, who became an

outspoken advocate for alternative medicine and specifically organic food.[2]  Eventually, after

years of battling cancer, Mr. Grinberg's mother succumbed to the disease in 2000, and his father,

who was living in a vegetative state for several years, died precisely two years to the day later.

### 4.    Mr. Grinberg Creates His Own Family

Though the responsibilities Mr. Grinberg assumed over his parents and nephews were

substantial, it was important for Mr. Grinberg to build a family of his own.  In 2006, he met the

woman who would become his wife, Olga Grinberg, through mutual friends.  As Olga tells it,

they "instantly felt a connection….There was something that touched me very deeply about him:

his energy, optimism, his ideas of [the] family bond, his emphasis on the loyalty, and

straightforwardness in relationship."  (Letter of O. Grinberg, Ex. C).  They married in 2009 and

decided to build a family together.   "We both [] had children from previous relationships and

our son is a blessing that brought all of our children together."  (Letter of O. Grinberg, Ex. C).

M██, who is now four-years-old and was named after Mr. Grinberg's father, was born the same

year Olga and Mr. Grinberg married.  Mr. Grinberg brought his now 12-year-old daughter,

S██, into the relationship, while Olga brought her now 25-year-old daughter, Julia.

Mr. Grinberg's daughter S██ was born in 2001, about a year after his mother passed

away, and was named after Mr. Grinberg's mother.  S██ spends several days a week with Mr.

Grinberg, Olga and four-year-old M██.[3]  When not staying with her father, S██ lives with her

mother in a house on Staten Island which is owned by Mr. Grinberg (though presently in

foreclosure).  Mr. Grinberg is very close to S██.  S██'s mother reports that "[n]o matter how

---

[2]    This interest would eventually lead Mr. Grinberg to open an organic food café in the East Village
of Manhattan, later run by his step-daughter Julia.

[3]    Mr. Grinberg provides support for his daughter in the form of her permanent residence, as well as
money he periodically pays to Ms. Kim when he can.  There is no formal child support order in S██'s
case.

busy he is, he always finds time for S████.  He bought her first bike and roller blades and taught

her how to ride and skate; he took S████ to her first Broadway musical "The Lion King"; she

received from her father her very first bouquet after her first dance performance at the age 4."

(Letter of I. Kim, Ex. D).  According to the mother of his child, "Vladimir calls S████ every

single day, he is on top of everything what's going on in his daughter's life. He knows all her

friends by name, he arranged a few play dates in his house for S████ and her friends."  (Letter of

I. Kim, Ex. D).  Ms. Kim stated that Mr. Grinberg has successfully incorporated S████ into his

family with M███ and Olga, including her on vacations and "in all events with his new family."

(Letter of I. Kim, Ex. D).

Mr. Grinberg's relationship with his eldest child, R████, is not as close.  R████'s mother,

Galina Pilmenstein, gave birth to their son in 1999, but did not immediately inform Mr. Grinberg

of the child and has since discouraged a relationship between the two.[4]  Mr. Grinberg has,

however, assumed stepfather responsibilities for Olga's oldest child Julia.  Julia revealed that:

> Without his advice, help, and constant approval I would not be where I am
> today.  While I was in my junior year of college I paid attention to social
> life more tha[n] my academic achievements.  It was a big mistake, but
> honestly, I was just confused and had no idea what I really want to do in
> the future.  Vladimir was around and helped me to find [the] right
> direction…

(Letter of J. Chebotar, Ex. A).  She added: "I owe him for that."  (*Id.*)

## 5.    U.S. Citizenship

Consistent with the dreams of many individuals who come to the United States seeking

refuge, freedom and opportunity, it was Mr. Grinberg's dream to someday become a United

---

[4]    Mr. Grinberg wanted to help support R████, so he and Ms. Pilmenstein entered into a child
support arrangement and, up until the time of his arrest, Mr. Grinberg made bi-weekly child support
payments of approximately $500, never missing a payment.  Since his arrest, however, he been unable to
make these payments and presently owes Ms. Pilmenstein over $14,000.

States citizen.  After many years of work and patience, Mr. Grinberg became a naturalized United States citizen in December 16, 2008.

### B.      Professional Background

Mr. Grinberg knew from a relatively young age that he wanted to be a psychologist and focused all his training in the mental health discipline.  As previously noted, Mr. Grinberg obtained a psychology degree from Kiev University in Russia and then obtained a position teaching psychology to teachers in St. Petersburg.  Unlike many of the individuals in this case who provided "modality" services, Mr. Grinberg was a trained and licensed professional, initially in psychology, and then in social work.

### 1.      Getting His Start in Mental Health Services in the United States

When Mr. Grinberg arrived in the United States he was caring for his sisters' children and working hard jobs "[s]even days a week with no stop.  Amazingly he could find time and work as a volunteer for [a] psychologist and helped him to conduct seminars."  (Letter of S. Gluzberg, Ex. B).  As Mr. Grinberg's aunt recalled, when Mr. Grinberg could not obtain paid work in mental health services, he tracked down an American psychologist who he had met in Russia and successfully convinced him to take Mr. Grinberg on as an unpaid intern.  Eventually Mr. Grinberg was hired by the Jewish Board of Family and Children Services ("JBFCS") and worked on the Russian Adolescent Project.  Mr. Grinberg continued working with the JBFCS for many years, focusing primarily on children with mental health issues.  Ultimately JBFCS awarded a scholarship to Mr. Grinberg which allowed him to return to earn his master's degree in social work from Adelphi University in or about 1994.  He was the first member of his family to graduate from an American university.  (Letter of S. Vaserman, Ex. H).

Mr. Grinberg's accomplishments were hard-fought.  He went to school, worked, interned, helped raise his nephews, and took care of his ailing parents, all while being told that he should not pursue his chosen profession.  His aunt recalled:

> [H]e tried for [a] mental health position and applied to college. I admired his persistence and determination, because honestly I was the one who had so many reservations and often openly told him that this profession is 'only for native speakers and he is very unlikely to succeed, so he need to find a more practical vocation.' He never answered and just worked harder.

(Letter of S. Gluzberg, Ex. B).

Mr. Grinberg soon became a Licensed Master Social Worker by the State of New York Department of Education in 1994 and returned to work with JBFCS as a staff therapist and social worker.  Hungry for experience, Mr. Grinberg also picked up as much work as he could as a therapist for New Hope Guild and Queens Mental Health.

### 2.    Mr. Grinberg Enters Private Practice

While working for many years at the JBFCS, helping children with mental health issues, Mr. Grinberg began his first business, Family Consultant.  Family Consultant was a private mental health services office for Russian language-speaking families.  It provided a wide range of services including a hotline staffed by mental health professionals, a magazine designed to increase awareness about mental health issues, and traditional therapy.

In late 2000, after the passing of his mother, Mr. Grinberg left JBFCS.  He wanted to partner with a psychologist in order to provide a greater array of services to his clients.  And as Mr. Grinberg had been able to practice psychology while in Russia, psychology was an important component in the suite of mental health services.  Mr. Grinberg started Citywide Social Work and Psychological Services ("Citywide") and partnered with Dr. Marvin Weiner.  While at Citywide, Mr. Grinberg met and began to work with Dr. Braun who provided

psychological services for Citywide as its employee. Dr. Weiner, however, eventually decided he wanted to retire and as a result Citywide was disbanded in or about 2002.

Thereafter, Mr. Grinberg began Allstate Social Work and Psychological Services PLLC ("Allstate") in or about 2002. Dr. Heather Dawson, who had worked as a staff psychologist at Citywide agreed to become Mr. Grinberg's new partner at Allstate. Allstate was Citywide's successor and employed many of the same employees, including Dr. Braun. However, in or about 2004, Dr. Dawson decided she wanted to teach at a local university and left the company.

Having had his two partners retire from the practice of clinical psychology, Mr. Grinberg decided to build his next business alongside his long-time employee Dr. Braun. Dr. Braun remains Mr. Grinberg's partner to this day. Together Dr. Braun and Mr. Grinberg formed Five Boro Psychological Services, P.C. in about 2004. It also provided mental health services to local clinics. The clinic was incorporated in its first iteration by Dr. Braun, while Mr. Grinberg had a significant management role, focused primarily on billing while Dr. Braun oversaw the clinical treatment issues and the mental health practitioners. While Citywide and Allstate terminated because of Mr. Grinberg's partners, Mr. Grinberg and Dr. Braun voluntarily reincorporated their next businesses because counsel advised that doing so was good business practice. Dr. Braun incorporated the business under the name All Boro Psychological Services PC ("All Boro"), but their business model remained the same.

Finally in 2010, they formed Five Boro Psychological and Licensed Master Social Work Services, PLLC ("Five Boro"), incorporated by both Mr. Grinberg and Dr. Braun, and providing both psychological and social work services to various types of health care facilities (not

exclusively no fault clinics).  Mr. Grinberg was the 75% owner and operator until February 2012, when he was arrested in the instant matter.[5]

### 3.   Mr. Grinberg's Business Model

Mr. Grinberg's business connected his psychologists with patients who were visiting clinics in the aftermath of automobile accidents, *inter alia*.  Mr. Grinberg appreciated that often mental health problems were stigmatized and patients were often reticent to bring them to the fore.  Many times patients, and medical doctors, did not recognize the relationship between a patient's physical problems and his mental health.  Mr. Grinberg's business was an avenue whereby he could provide these services to a population of people who may not otherwise have access to them.

But Mr. Grinberg did not operate a clinic and did not independently have access to facilities that would allow his psychologists to see patients in-house.  Instead he was required to rent space in clinics for his professionals to carry out their work with patients.  While some of these payments were kickbacks, and were the subject of Mr. Grinberg's plea, the clinics provided genuine services to the business which included: private office space for both the psychologist and the assistant; use of copy machines and fax machines; and storage of private medical records.  Mr. Grinberg's mental health providers typically set up shop within a clinic once a week.  When patients came into the clinic their goal was to be seen by their primary doctor.  The primary doctor would determine if the patient needed a prescreening checklist for psychological services.  The checklist sought information about headaches, nervousness, fear, sleeplessness and

---

[5]      What is most noteworthy about Mr. Grinberg's professional history is that, while collection efforts often extend for years and year, these businesses effectively existed *ad seriatim*.  Unlike many of Mr. Grinberg's co-defendants who were simultaneously responsible for many no fault clinics or modality clinics at once, and thus responsible for a sprawling fraud in many instances, Mr. Grinberg was really only running a single clinic; while the names and partners changed over time, it was always basically one business.

other symptoms which may suggest a predisposition for psychological problems.  If the primary

doctor determined it was appropriate, he would refer the patient to one of Mr. Grinberg's

psychologists.  Alternatively, the patient could request the assistance of a psychologist as a self-

referrer.  The patient would then have an initial evaluation with the psychologist to determine

whether additional treatment would be required.

As is not uncommon in the insurance industry, the necessity of services actually provided

by firms associated with Mr. Grinberg has been litigated repeatedly in the state courts, and in

these proceedings, the businesses have been represented by counsel handling many claims in

both the trial and appellate courts.  Physician and experts have testified repeatedly under oath,

and have provided affidavits attesting to the necessity of care given; some of these physicians are

associated with the firms in question; others were independent medical examiners.

Similarly, Mr. Grinberg had policies, procedures and practices in place to screen

fraudulent activity which demonstrates that throughout most of his business operations, he was

determined to avoid the very conduct he eventually engaged in.  There were staff meetings,

forms and memoranda provided to staff members to provide guidance on how and when to

administer tests.  Some of the testing materials were taken from sources external to the firms, and

relied upon as recognized standards in the field.  The firms' activities were also regularly

subjected to peer review.  The firms did not administer a rote series of exams to any and all

comers.  Efforts were made to determine the necessity of various protocols on a case-by-case

basis.  Far from engaging in a mill devoted to rolling over phantom claims, Mr. Grinberg was

actively involved in efforts to provide quality care.

Mr. Grinberg additionally instituted a number of steps to ensure that patents received

quality care.  As Dr. Dougherty described, "Our job was to evaluate the consequences of car

14

accidents on patient's mental status.  It was extremely important to him that our evaluations be thorough, and he monitored the amount of time we actually spent with patients."  (Letter of Dr. Dougherty, Ex. N).  Similarly, Dr. Bonaparte shared that "[a]s a fellow mental health professional, I always enjoy[ed] the energy of his discussions and the connection he has with being a helping / service professional, going back to his days as a student/trainee."  (Letter of Dr. Bonaparte, Ex. K).  While others in the industry hired psychologists straight out of school, social workers, or those with limited experience, Mr. Grinberg hired only those holding doctorates. Mr. Grinberg also instituted a cap on the number of patients that could be seen by the company and by the doctors so as to ensure that his doctors were not incentivized to rush though their examinations with patients.  Mr. Grinberg also paid his doctors a flat fee per patient.  Under this compensation structure doctors would not be tempted to engage in more financially rewarding examinations, rather than in the type of examination medically required by the patient.  Mr. Grinberg also took adverse employment action against those he suspected of unethical behavior.

Mr. Grinberg's employees recall the steps Mr. Grinberg engaged in to create an ethical workplace.  As his former colleague Dr. Mickaelle Dougherty wrote about Mr. Grinberg:

> I understand the nature of what his crime was here, but I can assure you that, when we worked together, Vladimir did his best to have an ethical company. For example, he often stressed how important it was that patients not be evaluated unless they had endorsed symptoms on the screening symptom checklist.  It is my understanding that some companies do evaluate patients in the absence of symptoms, simply to generate income.  Vladimir stressed, many times, that this was not the kind of company he was running and that he was doing his best to be ethical in every way, despite whatever mistakes he may have eventually made.  I know he cared deeply for the patients.

(Letter of Dr. Dougherty, Ex. N).

To be clear, Mr. Grinberg does *not* raise these matters to suggest that he is not responsible for submitting insurance claims which included treatment which was medically

unnecessary.  Were that the case, he would never have pleaded guilty and would have continued

to trial.  Rather, it is raised here to demonstrate that Mr. Grinberg cannot be painted with a broad

brush as a universal fraudster.  He paid kickbacks to permit his mental health practitioners access

to the three No Fault Clinics which were a portion of the focus of this prosecution.  Similarly, he

submitted some insurance claims from these three clinics which involved medically unnecessary

treatment.  But this does not mean that everything Mr. Grinberg ever did was fraudulent, or even

that the fraud he admitted to committing should now overshadow all his good works as a health

care practitioner and manager of other health care practitioners.  Mr. Grinberg is guilty to that

which he pleaded guilty, but this conduct was truly aberrant in every sense, and thus makes him

deserving of leniency by the Court.

### III.    The Prosecution and Guilty Plea

On February 29, 2012, Mr. Grinberg was arrested for the conduct underlying the

indictment in this case.  On June 28, 2013, pursuant to a plea agreement with the Government,

Mr. Grinberg pleaded guilty before Your Honor to Counts Two and Four of superseding

indictment S14 12 Cr. 171 (JPO).  Specifically, Mr. Grinberg pleaded guilty to a conspiracy to

commit health care fraud, in violation of Title 18, United States Code, Sections 1347 and 1349,

and conspiracy to commit money laundering, in violation of Title 18, United States Code,

Section 1956(h).

In connection with his plea, Mr. Grinberg has agreed with the Government on the

application of the United States Sentencing Guidelines.[6]  Specifically, Mr. Grinberg has

stipulated that his base offense level is 6, pursuant to U.S.S.G. § 2B1.1(a)(2); his offense level is

increased by 14 levels corresponding to the intended of loss of more than $400,000 but less than

---

[6]      The stipulated Sentencing Guidelines calculation described herein has been adopted by the U.S.
Probation Office.  (*See* PSR §§ 65-79, 114).

$1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).  The parties agreed that, in lieu of

identifying and utilizing specific fraudulent insurance cases, this loss amount would be $943,976

– representing the sum of monies paid by insurance companies to Mr. Grinberg's clinic (first All

Boro and then Five Boro) for treatment at the three No Fault Clinics central to the prosecution:[7]

|  | All Boro | Five Boro |
|---|---|---|
| **NTT Medical, P.C.** | $415,239.05 (7/16/08 – 5/25/10) | $149,316.97 (5/26/10 – 2/16/12) |
| **Dr. Joseph Vitoulis, P.O., P.C.** | $70,230.86 (2/4/10 – 5/25/10) | $180,768.34 (5/25/10 – 7/8/11) |
| **Maguire Medical Practice, P.C.** | $75,644.68 (8/24/09 – 5/25/10) | $53,042.94 (5/26/10 – 6/27/11) |

In addition to agreeing to the loss amount, the parties stipulated that Mr. Grinberg's offense level

is increased by 2 levels because the offense involved 10 or more victims, pursuant to U.S.S.G. §

2B1.1(b)(2)(A); his offense level is increased by 2 levels because the offense involved

sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C); his offense level is increased by 2

levels because the defendant pleaded guilty to a single count of money laundering in violation of

18 U.S.C. § 1956(h), pursuant to U.S.S.G. § 2B1.1(b)(2)(B); and his offense level is decreased

by 3 levels because of his complete and timely acceptance of responsibility, pursuant to U.S.S.G.

§§ 3E1.1(a) and (b).  Based on his stipulated offense level of 23 and the fact that Mr. Grinberg

has no criminal history whatsoever and is in Criminal History Category I, his resulting stipulated

Guidelines range is 46 to 57 months.  The plea agreement specifically permitted the parties to

seek sentences outside the Stipulated Guidelines Range, based on the factors contained in Title

18, United States Code, Section 3553(a).

---

[7]     Notably, it is clear from this chart that Five Boro effectively replaced All Boro, and as indicated
above, Mr. Grinberg was really only ever responsible for a single business entity, unlike many of his co-
defendants, including several who have already been sentenced.  Also, the specific amounts on the chart
should be considered best approximations.

**IV.**     **Sentencing**

**A.**     **Overview of Sentencing Factors**

In determining Mr. Grinberg's sentence, the Court considers a broad range of statutory sentencing considerations, along with the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); 18 U.S.C. § 3553(a) (2010). The Court must impose a sentence sufficient, but not greater than necessary, to achieve the objectives of sentencing. 18 U.S.C. § 3553(a); *see Kimbrough* v. *United States*, 552 U.S. 85, 89 (2007); *Gall* v. *United States*, 552 U.S. 38, 55-57 (2007). The goals of sentencing as set forth in Section 3553(a)(2) are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). In making its individualized assessment necessary to meet the goals of sentencing, the District Court must contemplate, consider and give appropriate weight to the following factors, pursuant to Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the applicable sentencing guideline range and Sentencing Commission policy statements; (4) the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; (5) the need to provide restitution to any victims of the offense; and (7) the need to provide needed medical care to the defendant in the most efficient manner. *See* 18 U.S.C. § 3553(a)(1) – (7).

After determining the advisory Guideline range, the Court must next independently determine whether an appropriate sentence meets the goals of sentencing in light of the Section

3553(a) factors, and must consider arguments that the advisory Guidelines should not apply on various policy or case specific grounds.  *See Rita* v. *United States*, 551 U.S. 338, 347-51 (2007). While the Court is required to take account of the advisory guidelines, together with other sentencing factors, it may not presume that the advisory guideline range is reasonable.  *See Gall,* 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (JSR) (holding that "where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").

As with the defendants who have been previously sentenced in this case, it is clear the Court will carefully evaluate all the 3553(a) factors and, consistent with that approach, individually apply all the factors to Mr. Grinberg.  In order to best assist the Court in calculating the appropriate sentence, the following sections of this memorandum (1) describe the nature and circumstances of the offense pursuant to Section 3553(a)(1); (2) analyze the issues which have arisen in prior sentencing hearings in this case in an effort to ensure the Court avoids unwarranted sentencing disparities pursuant to Section 3553(a)(4); (3) deconstruct the stipulated Guidelines sentence to demonstrate their limited value in this case pursuant to Section 3553(a)(2); and (4) discuss in more depth the history and characteristics of Mr. Grinberg pursuant to Section 3553(a)(1).  These factors in concert mandate sentencing *substantially* below the Guidelines range, which is sufficient but greater than necessary to meet all the sentencing goals of Section 3553(a)(2).

### B.    The Section 3553(a) Factors

### 1.    Nature and Circumstances of the Offense

The defense submits that, while the fraud committed by Mr. Grinberg is serious, a number of factors regarding the nature and circumstances of the offense, as well as his limited role in the broader conspiracy, are important considerations by the Court.

Mr. Grinberg's involvement in the crimes to which he pleaded guilty is fairly straightforward. He was a psychologist by training, and licensed in the State of New York as a social worker. For the past ten years, he has partnered with a licensed psychologist, co-owning a business which provided psychological and social work services to patients at various clinics in Brooklyn, consistent with his lifelong vocation. While operating his business – first All Boro and later Five Boro – Mr. Grinberg did not see patients himself, but was responsible for receiving reports and billing information from the treating mental health professionals, and then billing the insurance companies accordingly. At various points between 2008 and 2012, Mr. Grinberg's practitioners provided mental health services to patients at numerous clinics including three No Fault Clinics involved in this case, NTT Medical, P.C.; Dr. Joseph Vitoulis, P.O., P.C.; and Maguire Medical Practice, P.C. Some of the psychological testing and treatment administered at these clinics, and for which Mr. Grinberg billed insurance companies, was beyond what was medically necessary. In addition, Mr. Grinberg made kickback payments to the Controllers of these three No Fault Clinics in order to secure access to patients. These kickbacks took the form of a "rent" payment or payment to third parties or even a blank check,

as directed by the No Fault Clinic Controllers so they could conceal the origin of the funds and promote their illegal operations.[8]

Unlike many of his co-defendants, Mr. Grinberg never made any efforts to hide his conduct from anyone: not insurance companies, not other health care practitioners, not the State of New York, and not law enforcement. There has been much discussion during this prosecution of the so-called "fraudulent incorporation" theory. As the Court is aware, the viability of this theory was the subject of significant pre-trial motions already. Mr. Grinberg did not plead guilty to fraudulently incorporating his businesses, nor was such a plea required from him. It is, however, a key differentiator from other defendants in this case as discussed below. In this regard, Mr. Grinberg had no intent to fool the State or insurance companies; unlike some of his co-defendants, he never sought to hide his involvement with his business. Mr. Grinberg was openly engaged in collection actions with insurance companies and no accusation of fraudulent incorporation had ever been brought against him or his partners over the years.

Mr. Grinberg's acknowledges that, unlike Five Boro, his prior business, All Boro, was incorporated solely by Dr. Braun, but this was done so with specific guidance and advice of counsel that he did not need to be listed on the incorporation documents. As an initial matter, this is at most a technical issue: as a licensed professional he was permitted under the law to partner with a psychologist to operate these clinics which provided psychology and social work services to patients. (*See* Ex. P). Furthermore, Dr. Braun oversaw all the clinical aspects of the

---

[8]     This conduct constitutes the money laundering charged to which the defendant pled guilty. To be clear, there is no accusation that Mr. Grinberg personally went to check cashing places himself to anonymously obtain cash, but rather used All Boro and Five Boro business checks to pay the kickbacks. Thus, while he may have been helping the No Fault Clinic Controllers launder money, and is therefore guilty of the charge, it should be noted that he was in no way trying to conceal his own involvement in the fraud. Regardless of how the No Fault Clinic Controllers intended to mask these payments, Mr. Grinberg made *zero* effort to hide his or his company's involvement in these transactions.

business, supervised the practitioners' clinical work, and himself saw patients in various clinics –

he was not a figurehead or a "doc -in-the-box," as that term has been used in this prosecution.

Dr. Braun was far from a "straw" partner.  Mr. Grinberg has worked with Dr. Braun for

approximately 10 years.  Dr. Braun started as a mere employee, and eventually graduated into

the role of partner.  (Letter of Dr. Braun, Ex. L).  Mr. Grinberg was in no way hiding "behind the

scenes," nor was Dr. Braun a partner in name only, as suggested by the fraudulent incorporation

theory.  Furthermore, the most recent iteration of his business, Five Boro, was incorporated in

2010 by both Dr. Braun and Mr. Grinberg together, belying any claim that Mr. Grinberg tried to

hide his involvement in these businesses from the State or from the insurance companies.  All

Boro and Five Boro operated identically and there is no accusation to the contrary.

### 2.      Avoiding Unwarranted Sentencing Disparities

A crucial consideration in sentencing is an analysis of how Mr. Grinberg's criminal

conduct compared to his co-defendants.  In this regard, the Court must ensure that Mr.

Grinberg's sentence avoids any unwarranted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct, pursuant to 18 U.S.C. §

3553(a)(6).  At the time of this memorandum's submission, the Court has sentenced seven

defendants in connection with the network of fraud prosecuted by the Government.  During these

sentencing hearings, the Court articulated many aggravating and mitigating factors present in this

case, which inform the proper determination of sentences; similarly, at these hearings, the

Government's position highlighted the same.

Pursuant to the Court's April 15, 2013 Order, the defense herein marshals these factors,

and the key similarities and differences between Mr. Grinberg and his co-defendants in an

attempt to discern their relative culpabilities.  The defense respectfully submits that, when Mr.

Grinberg's circumstances are compared with those of his co-defendants (and their reduced

sentences), it is clear that a lenient sentence, substantially below the Guidelines range is sufficient, but not greater than necessary, to achieve the goals of Section 3553(a).

### a.      The Spectrum of Culpability

During the sentencing hearings, the Government has described the "ringleaders" of the charged conspiracies as those charged with the racketeering conspiracy – the RICO Defendants. (*See*, *i.e.*, Sentencing of Andrey Anikeyev, 9/9/13, Tr. at 29). According to the Government, it drew the line between defendants who owned and operated "brick and mortar" No Fault Clinics (designated RICO Defendants charged with a racketeering conspiracy), and the other defendants, ranging from modality controllers to health care practitioners to lawyers, all of whom were deemed less culpable and "lower" in the conspiracy than the RICO Defendants. Notably, none of the RICO Defendants have yet been sentenced in this case, but rather all seven sentenced defendants fall into the latter, less culpable category of non-RICO defendants, and in each case, their sentences have appropriately varied downward from the Sentencing Guidelines. Mr. Grinberg is clearly in this category.

With respect to the lowest end of the spectrum, the Government has said that the "bottom of the charged defendants in this case," include the practitioners who saw the patients at the No Fault Clinics because they "did not own the clinics. . . who received a salary, who did not profit from the fraud other than to have a job, were not masterminds of the scheme, were not operating the scheme, were not really aware of the whole parameters of the scheme." (Sentencing of Chad Greenshner, 7/1/13, Tr. at 9). In the case of these individuals – including chiropractor Dr. Chad Greenshner,[9] acupuncturist Pavel Poznansky,[10] and chiropractor Dr. Constantine Voytenko[11] –

---

[9]      Dr. Greenshner was a chiropractor "who submitted no fault insurance claims for services which were unnecessary or inflated," and was held "accountable for losses between $200,000 and $400,000 (the category below Mr. Grinberg). (*See* PSR § 52). On July 1, 2013, the Court sentenced Dr. Greenshner to,

the Government stipulated to a minor role reduction under the Guidelines, reducing their ranges below those of their co-defendants. [12]

As he was neither a practitioner, nor a RICO Defendant, there remains a question of where in the lower spectrum to place such individuals like Mr. Grinberg – ostensibly a "modality controller," at least in function.  There are several individuals who have been sentenced who *generally* fit into this broader category: Sergey Gabinsky,[13] who was a licensed medical doctor who assisted in the formation of fraudulently incorporated acupuncture clinics; Andrey

---

*inter alia*, 6 months' imprisonment and restitution of $239,360.59.  (*See* PSR § 18).  This sentence was one third of the low end of his 18 to 24 month stipulated Sentencing Guidelines range.

[10]     Mr. Poznansky was an acupuncturist "who worked in a No Fault Clinic and submitted bills to insurance companies for services" he did not perform and was held accountable for $200,000 and $400,000 (the category below Mr. Grinberg).  (*See* PSR § 57).  On August 6, 2013, the Court sentenced Mr. Poznansky to, *inter alia*, 9 months' imprisonment and restitution of $399,743.27.  (*See* PSR § 13).  This sentence was half of the low end of his 18 to 24 month stipulated Sentencing Guidelines range.

[11]     Dr. Voytenko was a chiropractor "who submitted no fault insurance claims for services which were unnecessary or inflated," and was held "accountable for losses between $200,000 and $400,000 (the category below Mr. Grinberg).  (*See* PSR § 52).  On October 4, 2013, the Court sentenced Dr. Voytenko to, *inter alia*, 3 years' probation with six months of home confinement and restitution of $282,419.41.  (*See* Sentencing of Constantine Voytenko, 10/4/13, Tr. at 15).  This sentence was a significant departure from his stipulated Guidelines range of 18 to 24 months.

[12]     The Government has suggested the practitioners were minor participants, but it is worth noting that these defendants were indeed on the front-line of the fraud and clearly knew, more so than anyone else, that the treatments they were administering were unnecessary, or that they were documenting treatments they had not provided, exclusively for overbilling purposes.  It cannot be said that these defendants were ignorant of the scope of the fraud.  (*See* Sentencing of Chad Greenshner, 7/1/13, Tr. at 9 (THE COURT: "Presumably [the Government's] position is [the practitioners] were aware that particular patients, they were giving them treatments and they didn't need them so they must have known something was amiss.")).

[13]     Sergey Gabinsky was a licensed medical doctor "who formed professional companies for others so that they could bill insurance companies for medical treatment," knowing that these companies were fraudulently representing to the insurance companies that he was the real owner of these corporations, which he was not.  Dr. Gabinsky was held "accountable for losses between $1 million to $2.5 million (the category *above* Mr. Grinberg).  (*See* PSR § 52).  On September 4, 2013, the Court sentenced Dr. Gabinsky to, *inter alia*, 24 months' imprisonment and restitution of $2, 029, 916.68.  (*See* PSR § 14).  This sentence was just more than half of the low end of his 46 to 57 month stipulated Sentencing Guidelines range.

Anikeyev,[14] who owned and controlled many fraudulently incorporated acupuncture clinics; and

Dmitry Slobodyansky,[15] who owned and controlled multiple chiropractic clinics.  The defense

respectfully submits, for the reasons discussed herein, Mr. Grinberg is properly considered to be

of the lowest culpability among these modality controllers, and even on par if not lower than the

practitioners whom the Government has placed at the very bottom of the scheme.

### b.     Breach of Trust and Oaths

At the sentencing hearings for the practitioners, the Government took the position that

these defendants were at the low end of the criminal conspiracy, but nonetheless highlighted

aggravating factors with respect to their criminal conduct.  The defense suggests that these

factors make the practitioners even more culpable in a sense than Mr. Grinberg.  For example, in

arguing against leniency, the Government argued a number of countervailing considerations,

> not the least of which is that he has a special skill and a license, and that,
> not only should that not be an excuse for him getting out of jail time, it
> should actually be a reason in favor of more jail time because he had the
> experience, the education, the understanding that comes with an advanced
> degree, and he should be held to a higher standard, and his failure to abide
> by the law should be taken more seriously, not less seriously.

---

[14]     Andrey Anikeyev was "the owner and controller of a number of acupuncture clinics" and
"utilized others to incorporate the clinics and paid kickbacks to the No Fault Clinic Owners for patient
referrals to his acupuncture clinics." (*See* PSR § 54).  Mr. Anikeyev was held "accountable for losses
between $2.5 million and $7 million (two categories *above* Mr. Grinberg).  (*See* PSR § 54).  On
September 9, 2013, the Court sentenced Mr. Anikeyev to, *inter alia*, 42 months' imprisonment and
restitution of $4,102,273.67.  (*See* PSR § 16).  This sentence was over a year lower than the low end of
the 57 to 60 month stipulated Sentencing Guidelines range.

[15]     Dmitry Slobodyansky was "a controller of multiple chiropractic clinics, who directly paid
kickbacks to the owners and controllers of no fault clinics for each patient referral for which he was able
to fraudulently bill insurance companies." He worked out kickbacks to place his own chiropractors in
clinics to provide unnecessary and excessive medical treatment for which [he] could bill insurance
companies." He "wrote checks disguised as "rent" checks for space in the no-fault clinics, paid bills for
utilities and other expenses, and wrote checks that were cashed with check cashers in order to generate
cash.  Mr. Slobodyansky was "accountable for losses between $400,000 and $1 million (the same
category as Mr. Grinberg).  (*See* PSR § 53).  On September 9, 2013, the Court sentenced Mr.
Slobodyansky to, *inter alia*, 21 months' imprisonment and restitution of $494,125.02.  (*See* PSR § 15).
This sentence was sixteen months lower than the stipulated Sentencing Guidelines range of 37 to 46
months.

(Sentencing of Chad Greenshner, 7/1/13, Tr. at 17).  As the Court further determined, "[i]t was essential that doctors and other medical professionals, health care professionals at the bottom level of this fraud, that they were exercising their discretion and their professional judgment in a way that ultimately wasn't warranted and in a way that they realized wasn't proper."  (Tr. at 19). As the Court stated, "as a medical professional, he was in a position to know better and in some sense he is held to a higher standard because we rely on medical professionals to use their discretion and judgment and training to make the system work, and he failed in that."  (Tr. at 21). Thus, to the extent that the Government argued and the Court accepted the violation of their professional oaths to the patients, and the trust placed in them by patients on whom they laid their hands, as *aggravating* factors in sentencing, these factors do not exist with respect to Mr. Grinberg.

### c.    Mental Health Treatment vs. Physical Treatment

There is another distinction worth drawing between Mr. Grinberg and the sentenced health care practitioners, and that is the nature of the treatment at issue.  There is no question that insurance companies should never be made to pay for treatment beyond which is medically necessary or indeed actually administered.  Similarly, no patient should be subjected to unnecessary medical treatment regardless of what form it takes.  While fraud is fraud, not all medical treatment is the same.  As Mr. Grinberg has admitted in his plea allocution, he is ultimately responsible for submitting insurance claims for testing and treatment beyond that which was medically necessary.  But in these cases, at most, the patients of the mental health care practitioners may have been subjected to additional, unnecessary testing questions, or unneeded treatment involving more conversations about past life experiences, or learning breathing and relaxation tips for dealing with stress or lack of sleep.  This is far different from the physical treatment wielded by health care practitioners like Dr. Greenshner, Mr. Poznansky,

and Dr. Voytenko.  As an acupuncturist, Mr. Poznansky was responsible for "up coding" and "billing for excessive treatment," including "reinsertions" of acupuncture needles, and "excessive electronic stimulation." (*See* Sentencing of Pavel Poznansky, 8/6/13, Tr. at 16).  As the Government stated, "he had to know that some of these patients did not need the acupuncture treatment."  (Tr. at 16).  Candidly, Dr. Greenshner's and Dr. Voytenko's chiropractic adjustments were similar in this regard.  All of these treatments, when not medically justified, are far more intrusive and invasive than any tests or treatment which ever could have been administered by Mr. Grinberg's psychologists and social workers.  There were no spinal adjustments; no needles inserted into these patients; no medications and no physical conduct whatsoever.  While this does not excuse Mr. Grinberg's conduct, it demonstrates the stark difference in the ramifications his crime had on patients.

The defense does not suggest the sentences imposed on Dr. Greenshner, Mr. Poznansky, or Dr. Voytenko were too lenient.  For disparity purposes, however, it is crucial to consider that the practitioners' conduct violated the oaths of their professions and resulted in unnecessary and in a sense, extreme physical abuse of their patients, and these are not factors present in Mr. Grinberg's case.

### d.   Not All "Modality Controllers" Are The Same

As between the RICO defendants and the healthcare professionals, Mr. Grinberg must be properly considered in a third category of individuals like Mr. Anikeyev, Dr. Gabinsky, and Mr. Slobodyansky, who were not merely practitioners, nor did they run No Fault Clinics like the RICO defendants.  If this is the case, then Mr. Grinberg is certainly the least culpable of these defendants, as the scope and nature of his conduct was far less significant than these other modality controllers.

27

Unlike Mr. Grinberg, Mr. Anikeyev owned and controlled *many* acupuncture clinics, and used them as vehicles for fraud. (Sentencing of Andrey Anikeyev, 9/9/13, Tr. at 21). In the end, despite evidence of significantly more clinics at issue, the Government made clear that Mr. Anikeyev was being held responsible for "five or six" of the clinics, as per his plea. (Tr. at 21). By contrast, only a single business is attributable to Mr. Grinberg (All Boro and Five Boro were merely successors in interest to one another). The Government maintained that Mr. Anikeyev was a "significant player in the no-fault insurance world and perhaps far beyond what is reflected in the loss amount." (Tr. at 22). Mr. Anikeyev's loss amount was over *four times* higher than the loss amount for which Mr. Grinberg is being held responsible. (Tr. at 35). Mr. Anikeyev must be viewed as far more significant a participant in this criminal scheme than Mr. Grinberg.

As for Dr. Gabinsky, he quite literally sold his medical license, violating his professional oath, and as the Court found, his conduct "involved a breach of trust that we place in people who are licensed to practice medicine and have certain responsibilities that I think were violated in this case." (Sentencing of Sergey Gabinsky, 9/4/13, Tr. at 27-8). Dr. Gabinsky did not do this once or twice, but again and again, totaling at least "10 PCs that were incorporated within the time period of this conspiracy." (Tr. at 20). As the Government put it, "[B]y selling his license, he enabled others to really perpetrate a massive fraud against the insurance companies under the no fault system." (Tr. at 21). Whereas Mr. Grinberg ran a single, legitimate modality clinic, Dr. Gabinsky profited from fraudulently incorporating clinic after clinic, each of which would then submit fraudulent insurance claims. This was an exponentially more significant undertaking than Mr. Grinberg's crime, and on the loss amount, Dr. Gabinsky is responsible for more than *double* the fraud (in excess of $1 million more). While Dr. Gabinsky received the benefit of a sentence which varied by approximately fifty percent from the low end of his Guidelines range –

the same Guidelines range which Mr. Grinberg faces – there should be no question that Mr. Grinberg's sentence should be significantly lower.

On the surface, Mr. Slobodyansky's conduct seems similar to Mr. Grinberg's, as they were both licensed healthcare practitioners, did not see patients themselves, but rather were responsible for submitting the bills of others, and paying kickbacks to the No Fault Clinic Controllers to gain access to the clinic patients.[16]  But unlike Mr. Grinberg, Mr. Slobodyansky "tried to hide his own involvement from detection by insurance companies and law enforcement by opening up another P.C. or using another P.C. in another person's name."  (Sentencing of Dmitry Slobodyansky, 9/9/13, Tr. at 9).  When sentencing Mr. Slobodyansky, the Court stated:

> There's been discussion of a comparison to Mr. Poznansky.  There are obviously some similarities and some differences.  I believe that the loss amount is somewhat greater in this case and he received a significant share of profits, Mr. Slobodyansky, that is.  I also think his culpability is greater in certain respects in that he owned and controlled two clinics, one of which was incorporated by someone else, and the conduct was in some ways more widespread and somewhat more sophisticated.

(Tr. at 24).  As applied to Mr. Grinberg, the loss amount is in the same category as Mr. Slobodyansky, but Mr. Grinberg did not fraudulently incorporate any clinics, and he was the co-owner of one business (whose name changed over the years), not two.  As his fraud was not as complex, Mr. Grinberg should receive a significantly lower sentence than the 21 months imposed on Mr. Slobodyansky.

Finally, it is worth noting that Mr. Poznansky, primarily considered a mere practitioner, was somewhat of a hybrid, insofar as he also was the owner of his own P.C. (which was not

---

[16]     Notably, Mr. Slobodyansky's Guideline range was slightly lower than Mr. Grinberg's because he is not subject to a money laundering enhancement, as he was not required to plead guilty to money laundering.  The defense is not privy to Mr. Slobodyansky's plea negotiations and does not begrudge him a better deal, but it seems clear that his alleged money laundering conduct is virtually identical to Mr. Grinberg's. (*See* Sentencing of Dmitry Slobodyansky, 9/9/13, Tr. at 10).  This should be considered by the Court in comparing their relative culpability and their respective Guidelines calculation.

fraudulently incorporated) and responsible for billing insurance companies for the services he

rendered.  (*See* Sentencing of Pavel Poznansky, 8/6/13, Tr. at 7-8).  In a real sense, he did what

both Dr. Greenshner and Mr. Grinberg did combined.[17]  Because he engaged in the fraudulent

billing, Poznansky received a three months' higher sentence than Dr. Greenshner, a pure

practitioner.  This is a relatively modest increase for the conduct which forms the core of Mr.

Grinberg's criminal actions, and this differential should be considered by the Court in assessing a

proper sentence for Mr. Grinberg.

### e.    Personal Profiting from Fraud

A recurring issue in the sentencing hearings thus far has been the level of profit an

individual received from the fraudulent proceeds, rather than just receiving a salary.  The

following colloquy occurred during Dr. Greenshner's sentencing:

> THE COURT:  Was there any evidence that [Dr. Greenshner's] salary was affected by, was greater than it otherwise would have been, because his boss, the owner of the clinic, or the person who ran the clinic was involved in the scheme?
>
> MR. GOLDMAN:  That is a difficult question to answer because the only reason he had a job and a salary was because the clinic was part of the

---

[17]    Like Mr. Grinberg, Mr. Poznansky's business was not a fraudulently incorporated clinic –a significant mitigating factor.  The Government's description of Mr. Poznansky is telling:

> THE COURT:  And this was not a fraudulent incorporated clinic.
>
> MR. GOLDMAN:  No, it was not a fraudulent incorporated clinic.  This is based purely on the medical necessity.  When Mr. Poznansky incorporated it, he was a practicing acupuncturist there.  But I think a key distinction is that, that regardless of whatever the arrangement was that allowed for Mr. Poznansky's clinic to have space in the no fault clinic and to receive patient referrals from the no fault clinic, he billed for his own work and he received all of the money that the insurance companies were paid for that work.  He was not a salaried employee.  So he did derive, directly derive, profits from his up coding and of his excessive treatments and excessive billing.  And I think that's a critical distinction, to the extent that Your Honor is interested in how this defendant would relate to Mr. Greenshner, who was also a practitioner, also similar guideline range, but who did not incorporate his PC, and just merely received a salary. . ."

(Sentencing of Pavel Poznansky, 8/6/13, Tr. at 13).

> scheme.  It was not as if he was working at that clinic, at a legitimate
> place, and all of sudden the clinic went to a fraudulent place and his salary
> got bumped up $2,000.  He only had the job and salary because of the
> fraudulent arrangement that existed there.

(Sentencing of Chad Greenshner, 7/1/13, Tr. at 11).  This was not the case with Mr. Grinberg.

His income was not exclusively, or even primarily, reliant on the fraudulent arrangement.  Even

though Mr. Grinberg was the co-owner of his company, he too drew a salary, as did Dr. Braun,

and as did the health care practitioners they employed.  The practitioners – who performed the

same role as Dr. Greenshner and Dr. Voytenko – drew a salary, but that salary was based on how

often they worked and how many patients they saw.  Mr. Grinberg was not paid based on the

number of patients, or the number of claims for that matter, but rather he and Dr. Braun drew a

monthly salary.  They would also be able to share in year-end profits, though in all but one year,

there were limited profits to share.  When there were profits, it is important to remember that the

company's revenue was not exclusively from fraudulent No Fault Clinics – and indeed the illicit

funds were a small portion of the total revenue over time.  So it cannot be said that Mr. Grinberg

was exclusively motivated to submit the bogus insurance claims by extensive personal

enrichment, nor that (unlike someone like Dr. Greenshner), he only had a job and a salary

because of no fault insurance fraud.  That was simply not the case.

There are two points related to Mr. Grinberg's personal gain that are worth noting.  First,

anyone familiar with the no fault insurance world would say that, if you are in the business of

exploiting this broken system, the way to make money is not by opening a mental health care

treatment facility.  Unlike fields like chiropractic, acupuncture, and physical therapy, mental

health treatment does not require scores of visits and follow-ups, the ability to oversee extensive

therapies, prescription of durable goods, and ordering of MRIs, x-rays, and other expensive tests.

Indeed as the system (and even this case) reflects, the true money in this fraudulent operation is

31

in areas other than the limited and brief tests and treatment performed by mental health care practitioners. Mr. Grinberg was drawn to this line of work because it is his life's calling, *not* because of any goal to bilk insurance companies out of large amounts of money. If so, this was just not the way to do it. He clearly would have been better off partnering with a chiropractor, acupuncturist or physical therapist.

Second, because of these choices, Mr. Grinberg never led a fancy or wealthy lifestyle. This is in a sharp contrast from someone like Mr. Anikeyev, who "profited quite a bit from" his business of "fraudulently incorporating modality clinics," (Sentencing of Andrey Anikeyev, 9/9/13, Tr. at 29-30), and led an "extravagant lifestyle . . . because of his widespread involvement in this case." (Tr. at 26). Mr. Grinberg was *not* in the business of fraudulently incorporating clinics, but more so, lived a relatively modest life. As the PSR describes, Mr. Grinberg is in terrible debt and has been so for some time, made worse by the incredible damage Hurricane Sandy inflicted on him home and his family. Almost all the property Mr. Grinberg owned are in wholesale foreclosure, and he and his family are in dire straits. There can be no question that compared to Mr. Anikeyev, Mr. Grinberg's lifestyle was less extravagant, his criminal conduct less extensive, and accordingly, his sentence should be far less severe.

### f.       The Engine of Fraud: the Referring Attorney

Among the health care practitioners and clinic owners, is Sol Naimark, a practicing attorney working out of Queens, New York. Naimark would receive new patients recruited by runners, and would refer them to medical clinics, aware that the clinics would submit fraudulent billings to insurance companies for medically unnecessary treatment. (*See* PSR § 58). Mr. Naimark paid the runners for each patient brought to him, provided them with additional payments based on the insurance coverage and their frequency of visits to the No Fault Clinics, and paid kickbacks to the No Fault Clinics. (*See* PSR § 58). Mr. Naimark was held

32

"accountable for losses between $200,000 and $400,000 (the category below Mr. Grinberg). (*See* PSR § 58).  On October 9, 2013, the Court sentenced Mr. Naimark to, *inter alia*, a year and a day of imprisonment and restitution of $273,000 (*See* Sentencing of Sol Naimark, 10/9/13, Tr. at 33, 35).  In light of the good time credit Mr. Naimark will likely receive from the Bureau of Prison (as his sentence is a day longer than the twelve month threshold), his ultimate sentence will likely be closer to ten months, less than half of the low end of his stipulate Guidelines range of 24 to 30 months.

In arguing for a Guidelines sentence, the Government pointed out that as a licensed attorney, Mr. Naimark abused his specialized skill and knowledge and violated his sworn oath to uphold the law.  (*See* Sentencing of Sol Naimark, 10/9/13, Tr. at 23).   In imposing a sentence on Mr. Naimark, Your Honor acknowledged that his role was "essential to the operation of the conspiracy," and that he was "involved in the payment of kickbacks with no-fault clinics and in paying runners to bring patients to his law practice." (Tr. at 30).  Indeed, unlike every defendant thus far sentenced, Mr. Naimark knew of and promoted the fraud even before a single patient stepped inside a clinic's walls.  Without a source of patients from Mr. Naimark, this fraud scheme *could not succeed*.  This "10,000 foot view" makes Mr. Naimark more culpable than Mr. Grinberg, who did not use a network of runners to solicit and secure patient referrals and did not violate his sworn oath as Mr. Naimark did.

### 3.    United States Sentencing Guidelines

Because the advisory Sentencing Guidelines must still be calculated, the parties have entered into a stipulated Guidelines calculation.  There is no dispute as to the proper Sentencing Guidelines calculation in this case and the defense accepts this calculation and does not dispute the resulting sentencing range of 46 to 57 months.  Pursuant to the plea agreement, the parties are precluded from seeking, and Mr. Grinberg does not seek now, downward departures or

33

adjustments from this range, but Mr. Grinberg is explicitly permitted to seek variances from the Guidelines range based on the balance of Section 3553(a) factors.  As the case law prescribes, the Guidelines are not to be given undue weight or to be presumed reasonable and they *must* be discounted when appropriate to do so.  Here, the defense identifies fundamental flaws in the Guidelines' application to Mr. Grinberg's case.

a)      **The Loss Amount**

As the Court found in the sentencing of one of Mr. Grinberg's co-defendants, "the loss amount ends up driving the guidelines calculation to such an extent that it can overstate the culpability of a particular defendant." (Sentencing of Sergey Gabinsky, 9/4/13, Tr. at 26-7).  That is certainly the case with Mr. Grinberg.  While the amount of loss is the primary determinant of the offense level, loss is a highly imperfect measure of the seriousness of the offense.  By making a Guidelines sentence turn on this single factor, the Sentencing Commission ignored the other Section 3553(a) factors, guaranteeing that many Guidelines sentences are "irrational on their face." *United States* v. *Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).  As Judge Rakoff wrote in *Adelson*, "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Adelson*, 441 F. Supp. 2d at 512.

As per Mr. Grinberg's plea agreement, the parties have agreed that the loss amount from the offense to more than $400,000 but less than $1,000,000.  (PSR ¶ 67.)  This loss amount reflects the $943,976 in insurance money received by All Boro and then Five Boro related to care provided at No Fault Clinics NTT Medical, P.C.; Dr. Joseph Vitoulis, P.O., P.C.; and Maguire Medical Practice, P.C.  Notably, this number reflects only a portion of the work undertaken by All Boro and Five Boro during the same time period, and does not include work

34

done by Mr. Grinberg's mental health care professionals at other clinics, where there is no allegation of overbilling.

Importantly the $943,976 figure is not based on a complete audit of all patients, their medical treatment and corresponding insurance claims, but rather the gross proceeds received from insurance companies to Mr. Grinberg's companies.  Accordingly, while the parties stipulate to this figure for restitution purposes, it is important to note that this figure is not modified in any way for insurance claims of patients who did not receive medically unnecessary treatment, or for the portion of their treatment which was legitimate.  The defense concurs that this is a proper number to use for Guidelines purposes, but only raises the issue in an effort to show how the Guidelines are flawed as applied here, and a downward variance is appropriate.

### b)      Number of Victims

The stipulated Guidelines calculation accounts for a 2-level enhancement because the conduct involved ten or more victims.  (PSR ¶ 67.)  The parties stipulate to this enhancement since there were in excess of ten insurance companies which were impacted by the conspiracy; this has no correlation with the number of patients seen or who received unnecessary treatment.[18]

---

[18]      This point was made clear during Dr. Greenshner's sentencing:

THE COURT:  . . . First of all, there is a two-point increase for 10 or more victims.  I wanted to clarify is that the number of insurance companies or does that reflect something else in terms of victims?

MR: GOLDMAN:  . . . The government has calculated about 20 insurance company victims as part of this scheme, so that is where the number comes from.

THE COURT:  There aren't any patients here that are considered victims by virtue of getting treatment they didn't need or exposing them to some risk?

MR: GOLDMAN:  No, the patients are not victims of the scheme.

THE COURT:  Were the patients involved in this aware of what was going on in terms of being part of the scheme where the treatments were unnecessary?

MR. GOLDMAN:  To varying degrees, your Honor, the patients could easily be considered unindicted co-conspirators or they could be somewhat ignorant, or they -- not somewhat

But in a case like this, the number of victims enhancement contributes to a Guidelines range which overstates the criminal conduct.  Unlike in a criminal scheme where a fraudster seeks out more and more victims to dupe and defraud, thereby increasing the proceeds of the crime (such as in a Ponzi scheme), there is no correlation in this case between the number of distinct insurance company victims and the efforts by Mr. Grinberg or his co-defendants to obtain more fraudulent proceeds.  There is no correlation between the efforts of Mr. Grinberg or any of the co-conspirators to victimize more, distinct insurance companies.  Put another way, the crime would be no less significant if there was only one or two insurance companies insuring the same patient pool, but it would have an artificial impact on the Guidelines offense level.  Again, this issue is relevant to determine what weight to give to the Guidelines calculation in this case.

### c)    Sophisticated Means

Similarly, the parties have agreed that the stipulated Guidelines calculation includes a 2-level enhancement because the conduct involved "sophisticated means."  (PSR ¶ 67.)  Again, the defense does not dispute this enhancement, but simply notes that all "sophisticated" schemes for which the enhancement applies receive the 2-level increase regardless of how "sophisticated" they truly are.  In other words, whether a scheme is the most complex criminal conduct, involving international money transfers, off-shore accounts, and complicated financial transactions and methods to conceal the criminality, *or* the most basic fraud which nonetheless breaks the threshold for the application of the enhancement, the 2-level increase applies.  Since the defense believes that the evidence suggests this case is far more similar to the latter than the

---

ignorant, or they could have no idea the treatments provided to them were not medically necessary.

(Sentencing of Chad Greenshner, 7/1/13, Tr. at 4-5)

former, Mr. Grinberg requests that the Court should evaluate the Guidelines application to Mr. Grinberg's case, in light of that fact.[19]

### d)      Criminal History Category

There is no dispute here that Mr. Grinberg is in Criminal History Category I, because he has no criminal history points, has never been convicted of any crime, and in fact, has never been arrested prior to the events of this case.  (PSR ¶¶ 78-79.)

### e)      Conclusion

Since *Booker*, the district courts have regained the ability to depart or vary from the mathematical strictures of the Guidelines where the facts of a case justify such action. *See* U.S.S.G. § 1B1.1.  While the Guidelines calculation here is accurate, the identified issues with the components of the offense level reveal that the Guidelines range is overinflated in this type of case and as applied to Mr. Grinberg.  As discussed below, the other sentencing factors beyond the Guidelines are much more valuable in evaluating the proper sentence.  The Court would be well-justified in considering whether Mr. Grinberg's relative culpability and the nature of his offense conduct would be effectively redressed by a sentence substantially below the Guidelines range.

### 4.      History and Characteristics of the Defendant

As the Court is aware, in fashioning an appropriate sentence, the Court must also consider Mr. Grinberg's history and personal characteristics.  *See* 18 U.S.C. § 3553(a)(1).  The defense submits that Mr. Grinberg's history and personal characteristics warrant leniency.

---

[19]      At the sentencing of co-defendant Dmitry Slobodyansky, the Court made the same point: "At the end of the day, you know, what counts as sophisticated means is not necessarily an on/off switch.  I think there are different degrees of sophistication.  I think for purposes of the guidelines, [Mr. Solobodyansky's conduct] was sophisticated means, but there are others who had more sophisticated means.  So I'm going to take it into account." (Sentencing of Dmitry Slobodyansky, 9/9/13, Tr. at 21).

<u>No Criminal History/Aberrant Conduct</u>.  As discussed above, Mr. Grinberg is a committed father and husband, a man of integrity and humility, and a person for whom the criminal conduct at issue is considered completely out of character.  His ex-girlfriend and the mother of his child said it best: "He is an honest man who has no record or history of criminal activity, because he isn't one."  (Letter of I. Kim, Ex. D).

As a result, those who were closest to Mr. Grinberg repeatedly expressed surprise to find that Mr. Grinberg had become embroiled in criminal activity.  Vitaliy, the eldest of his two nephews, said "I was stunned and deeply hurt when Vladimir was indicted on February 29, 2012.  It came as a complete surprise to me." (Letter of V. Vaserman, Ex. I).  The youngest of his nephews acknowledged that while he "can't explain [Mr. Grinberg's] reasons or thoughts regarding the mistakes he has made but I do know that majority of his life has been full of selfless deeds." (Letter of S. Vaserman, Ex. H).  Similarly, Dr. Mickaelle Dougherty, a former psychologist working for Mr. Grinberg, wrote, that she was "very surprised to hear of his difficulties" and that her "sense [is] that whatever wrongs were committed were quite out of character for Vladimir."  (Letter of Dr. Dougherty, Ex. N).

<u>Personal Attributes</u>.  Many words have been used to describe Mr. Grinberg by his friends, family, colleagues and his Rabbi David Okonov of the Hebrew Alliance - F.R.E.E. synagogue in Brighton Beach.  Rabbi Okonov took particular note of Mr. Grinberg's religious devotion and community involvement: "he has shown and demonstrated time and again, his true commitment to Judaism and to its teachings."  (Letter of Rabbi Okonov, Ex. J).  Mr. Grinberg practices the teachings of his religion each day by demonstrating "honesty, concern for others, sense of humor, integrity" along with an unmatched work ethic.  (Letter of  Dr. Bonaparte, Ex. K).  And as a result, when Mr. Grinberg walks into any room "[p]eople were actually excited to see him

because he had a way of lighting up a room with his smile.  He always had a kind word for all

those he came in contact with." (Letter of Dr. Dougherty, Ex. N).  Mr. Grinberg's stepdaughter

describes him, quite simply, as "one of the best people I know." (Letter of J. Chebotar, Ex. A).

　　　Hard-Working.  A constant refrain among the letters provided by Mr. Grinberg's family

and friends concerns Mr. Grinberg's work ethic.  *See* Letter of O. Grinberg, Ex. C; Letter of D.

Tishchenko Ex. F; Letter of V. Vaserman Ex. I; Letter of S. Vaserman Ex. H; Letter of S.

Gluzberg Ex. B.  His stepdaughter believes, "[h]is work ethic is like no other person I have ever

met.  His hard work and energy is very contagious and he taught me a great deal." (Letter of J.

Chebotar, Ex. A).  Mr. Grinberg, during this period of unemployment, is even working *for* his

stepdaughter as a dishwasher in a small café she now runs.  (*Id.*)  Unfortunately, however, Julia

is unable to pay Mr. Grinberg because "[i]t is very difficult to make a penny." (*Id.*)

　　　Generous/Selfless Friend.  Chief among the reports from those who know him is that Mr.

Grinberg is "generous, and deeply motivated to be helpful to everyone." (Letter of Dr. Braun,

Ex. L).  Dr. Bonaparte described it as a "passion for serving others." (Letter of Dr. Bonaparte,

Ex. K).  Everyone can recall a time when Mr. Grinberg demonstrated great kindness.  His

employee Marina Byshevsky recounted that she would "never forget the most important thing,

he did for me.  When I was diagnosed with cancer, Vladimir asked if I needed help.  At the time,

we needed to choose medical insurance for our company.  I asked him to choose the medical

insurance that my hospital would accept." (Letter of M. Byshevsky, Ex. M).  And Mr. Grinberg

did so.  He also held her job while she received treatment.  Vladimir routinely was sympathetic

to the personal issues of his employees.  (Letter of G. Mironyuk, Ex. O).  Dr. Dougherty recalled

that when she was going through a divorce, Mr. Grinberg once encouraged her to talk about what

was troubling her:

> I cried in that confidential meeting in my office.  When I looked up I saw
> that there were tears in his own eyes.  I am always so impressed by people
> whose hearts are so open that they can feel another's pain to that extent,
> when the circumstances do not personally touch them in any way.  He was
> simply very compassionate, with a heart that is easily moved by others
> discomfort and a desire to be of assistance."

(Letter of Dr. Dougherty, Ex. N).  Certainly, as his rabbi attested, "Vladimir has a reputation as a

quiet man who never looks for attention or appreciation.  He just gets up and does all he can to

support and help our synagogue and our community as a whole."  (Letter of Rabbi Okonov, Ex.

J).

    Family Man.  The kindness and attention Mr. Grinberg shows to his friends does not

compare to that the care he shows his family.  The superlatives used to describe Mr. Grinberg's

singular devotion to his family abound: "an extremely dedicated family man" (Letter of Dr.

Bonaparte, Ex. K); "a fantastic father who would do anything for his children" (Letter of R.

Ogulnik, Ex. E); "a great brother.  He was always there when I or my children needed the moral

support or his time" (Letter of G. Vaserman, Ex. G); "Vladimir was a great son" (Letter of S.

Gluzberg, Ex. B).  Mr. Grinberg's relationship with his youngest children is clearly quite special.

Mr. Grinberg is "inseparable" from his four-year-old, M██, while many are worried about the

impact a period of separation will have on his 12-year-old daughter, S██.  *See* Letter of D.

Tishchenko, Ex. F; Letter of G. Vaserman, Ex. G; Letter of I. Kim, Ex. D; Letter of J. Chebotar

Ex. A.

    Mr. Grinberg's father-in-law, while acknowledging he had "reservation[s] and concerns"

about any man who was to be with his daughter, quickly found that in Mr. Grinberg he had a son.

He writes of Mr. Grinberg, "I consider him a son, I always wanted, but never ha[d] until the

moment he got into our family.  He definitely treats us as if we were his own parents.  It shows

in everything that he does for us that he cares. Nothing is difficult. It does not matter how busy

or tired he is, he never complain[]s and always [is] wil[l]ing to assist."  (Letter of D. Tishchenko,

Ex. F).  Mr. Grinberg's aunt echoed the sentiment.

> I am sincere to say that it is easier for me to call him and talk about what I
> need ,th[a]n call my own children.  Believe it is not easy for me to say it,
> but this is true.  I consider him like my son.  That is amazing that at his
> age, he somehow [] was able to assume [the] role of my older brother, his
> father, who always supported me.  He has a tremendous sense of
> responsibility for his family, for his kids and his wife.  That is not a
> burden, but a source of positive energy for him.

(Letter of S. Gluzberg, Ex. B).

Sole-Breadwinner.  Mr. Grinberg is not only the sole breadwinner for his family, but he

has also assumed the responsibility of putting a roof over the heads of his daughter, S███, and

her mother.  Without Mr. Grinberg, his family, already near financial ruin, would be devastated.

His wife, Olga, explained:

> Our residence is up for foreclosure and financially we have been
> struggling through those years.  Just relying on my income I would not be
> capable of providing for my son (4) and support my stepdaughter S███
> (12).  My credit is shot.  Because of [] my son birth I took a [break] from
> the workforce while working at home and my education is the only
> strength that I can use tin order to support my family financially.  I am
> probably overeducated and simply too old for many open entry positions
> these days and because of the gap in my employment history, it most
> likely I won't be able to secure managerial position.

(Letter of O. Grinberg, Ex. C).

Financially Modest.  As referenced above, Mr. Grinberg led a relatively modest lifestyle,

as contrasted with some of the others charged in this case.  As Mr. Ogulnik wrote, Mr. Grinberg

has "minimum materialistic needs…[and] would (and was) giving his last to help the people in

need." (Letter of R. Ogulnik, Ex. E).  As Mr. Ogulnik wrote in connection with his bail

application, "It may explain why, when need [arose] to place the bail – he didn't have any money

and we, the family, had to collect the bail funds. And he doesn't gamble or tak[e] expensive

vacations (if any) or dines in expensive restaurants.  In all instances that I'm aware of - his

'friends' and partners provided the helping hand leaving him with no funds."  (Letter of R. Ogulnik, Ex. E).  Mr. Grinberg's ex-girlfriend reports that Mr. Grinberg "is not your typical Russian immigrant-businessman whose life revolves around expensive cars and partying at the restaurants on Brighton Beach. He is not a materialistic person at all. When we lived together, he used to buy a lot of books, was reading at every spare moment, learning everything - from mechanisms of successful management to benefits of organic foods."  (Letter of I. Kim, Ex. D).

What money Mr. Grinberg has made over the years he has used to support his family, and also to invest in a handful of commercial and real estate properties, which include the Staten Island residence where his daughter S███ and her mother Irina Kim have resided for years rent-free, as well as his own residence at ███████████ in Brooklyn, New York. Unfortunately, the instant prosecution has devastated Mr. Grinberg beyond the obvious personal and emotional impact, but also financially, as he has been generally unemployed since his February 2012 arrest.  In that time, almost all the modest properties he has owned have been foreclosed on, including his home at ███████████ and the home he provides for his daughter, S███, and her mother on Staten Island.  As Mr. Grinberg's sister explained, "Vladimir and his wife are not able to pay the mortgage anymore and his house is foreclosed so his family can be on a street any day." (Letter of G. Vaserman. Ex. G).

Underscoring the genuine fear of homelessness that Mr. Grinberg and his family labor against, are the depths to which Mr. Grinberg has gone to protect his home in the face of Hurricane Sandy.  (Letter of J. Chebotar, Ex. A).   As the Hurricane was set to arrive, Mr. Grinberg determined that he needed to stay in his family's home and do what he could to preserve it from the weather's onslaught, while he evacuated his wife, Olga, and his four year old son, M██, to safety.  On or about the morning of October 28, 2012, as his family prepared to

leave, Olga smelled something burning in the home.  Mr. Grinberg immediately instructed his

wife to take his son and leave the house.  Mr. Grinberg followed the scent of smoke to the

basement where he located a fire inside one of the walls and screamed for Olga to call the fire

department.  He immediately began breaking through the plaster, with whatever he could get his

hands on, and doused water on the flames as he tried to save his home from becoming fully

engulfed.  Mr. Grinberg, motivated only by the fact that if his home burned then his family

would be homeless and knowing that he could not afford to rent an apartment, worked fearlessly

to calm the flames.  By the time the fire department arrived, Mr. Grinberg had done so but

burned both of his hands in the process.  (Letter of J. Chebotar, Ex. A).

   Injured and burned, Mr. Grinberg continued to guard his home.  Once Hurricane Sandy

hit, five to eight hours later, his home was enveloped in 13 feet of water.  (Letter of J. Chebotar,

Ex. A).   The entire basement was inundated, along with the first few feet of the first floor.  Mr.

Grinberg "used his bare burned hands to barricade the door but the water was so powerful it took

him off his feet" and ultimately his burns were infected.  (Letter of J. Chebotar, Ex. A).  Mr.

Grinberg, without the ability to secure alternate shelter, was forced to stay in a home ravaged by

the flood, infested with mold and left bereft of electricity, gas and a telephone connection.  Mr.

Grinberg was eventually able to send Olga and M█ to Philadelphia for approximately six

weeks, while he remained in the family's homestead and worked to put the pieces of their home

back together.  But Mr. Grinberg did more than that.  He helped his entire block: creating a

neighborhood phone charging station, and helping to pump water from others' homes, creating

lists of workers to assist in restoration.  (Letter of O. Grinberg, Ex. C).  "He did not call city to

complain, he did not wait for assistance to come.  He did not need to be thanked; he just does it,

because he thinks it is a right thing to do.  And I can go on and on." (*Id*.).  The adversity he

faced through this ordeal is particularly illustrative of Mr. Grinberg as a man, father and

husband: selfless, devoted, and dutiful.

    <u>Remorse and Requests for Leniency</u>:  Mr. Grinberg's family and friends have written

much about how deeply sorry is he is for his criminal conduct.  (Letter of Rabbi Okonov, Ex. J;

Letter of Dr. Braun, Ex. L; Letter of V. Vaserman, Ex. I).  Mr. Grinberg's brother-in-law, Rafail

Ogulnik wrote that Mr. Grinberg "is deeply ashamed and remorseful of his actions. The fact that

his children, for whom he was the sole provider, may end up with no roof over their head, makes

him miserable and almost suicidal."  (Letter of R. Ogulnik, Ex. E).  Mr. Grinberg's described the

conversation in which Mr. Grinberg informed him of the criminal charges as follows:

> All I know, when Vladimir took a plea, he called me and without looking
> for excuse he said 'I screwed up, sorry for letting down your daughter and
> your grandchildren.  I know exactly where I did wrong, I will serve the
> punishment I [] deserve[d] and will do my very best to earn your respect
> back.'  To hear this was very important to me, because I have seen many
> people who always looking for excuse and if they have done something
> once always find a reason why they did it and it just paves the way for
> future mistakes.  He did not.

(Letter of D. Tishchenko, Ex. F).

    Mr. Grinberg's wife shared a similar conversation she had with Mr. Grinberg regarding

his guilty plea.

> I think taking a plea helped him mentally to take a responsibility for the
> mistakes he had made.  One day he woke up and said 'I am going to take a
> plea, I made a mistake.  It's time for me to move on.  It's a lesson to stay
> true to myself and not to bend principle[s] for thing that is not important
> anyway.  This part of my life is over.  I have chance to change my life and
> it [is] a blessing.'  You don't hear things like that very often.  He is a
> Renaissance man.  That is what I love him for.  And I will stand by him
> for better or wor[se].

(Letter of O. Grinberg, Ex. C).

    Moreover, each of Mr. Grinberg's family and friends have begged the Court to show

mercy.  *See e.g.*, Letter of Rabbi Okonov, Ex. J ("I don't take lightly, as Vladimir does not, the

mistakes he has made. Though I ask you to be understanding and to give him the chance to grow from all of this, so that he can continue to be a good father to his children, and an active member of our community."); Letter of Dr. Braun, Ex. L ("With all my heart, I hope and pray that you will find it possible to be lenient in the sentencing."); Letter of J. Chebotar, Ex. A ("I hope that you take into account how much this family relies on him and what impact it will make on his children"); Letter of G. Vaserman, Ex. G ("I humbly ask the court to impose the most lenient appropriate sentence possible.")  And the reason each has done so is plain: "Vladimir's dedication, passion, expertise and positive influence are very much needed and would go a long way toward bettering the lives of many people in our society."  (Letter of Dr. Bonaparte, Ex. K).

These testimonials are a mere sampling of the lives Mr. Grinberg has touched.  The defense respectfully requests that the Court consider all that has been said about Mr. Grinberg when evaluating the application of the sentencing factors to his case and considering the specified purposes of sentencing under the statute.

### 5.   Purposes of Sentencing

The Court must ensure that Mr. Grinberg's sentence meets certain purposes of sentencing, as set forth in 18 U.S.C. § 3553(a)(2)(A)-(D).

#### a)   Seriousness of the Offense, Respect for Law, Just Punishment

Given Mr. Grinberg's role in the offense, myriad positive personal attributes, compelling life story, low risk of recidivism, and years of law-abiding conduct, a lenient sentence significantly below the Guidelines range reflects the seriousness of his offense, promotes respect for the law, and provides just punishment.  The crimes to which Mr. Grinberg pleaded guilty are serious: this case involved a wide-ranging conspiracy to commit health care fraud, and even if Mr. Grinberg's portion of the conspiracy was only a small part of the sprawling case, it does not diminish its serious.  Mr. Grinberg accepts that and understands the magnitude of his crime.

45

However, he has suffered a felony conviction, which will make it far more difficult to find meaningful work in the future. He has also suffered from the notoriety and press coverage that this investigation has received which lumps him in with many of his co-defendants whose conduct was far broader and more significant. Finally, he has accepted responsibility for his conduct in every possible way.

### b)   Deterrence

A sentence well below the Guidelines range – even a non-custodial sentence with a term of home confinement[20] – will provide sufficient deterrence to Mr. Grinberg. Candidly, the impact on Mr. Grinberg has already been profound and life-altering. It cannot be disputed that Mr. Grinberg is highly unlikely to commit crimes in the future irrespective of whatever punishment Your Honor imposes. As Dr. Dougherty professes, Mr. Grinberg "once told me that he believes God gives us chances to learn from mistakes and that we need to pay special attention to the lessons of living. Whatever mistake Vladimir made, I am certain he has learned from it and will never allow such a mistake to happen again." (Letter of Dr. Dougherty, Ex. N). Mr. Grinberg has lived a law-abiding life through the years, and has demonstrated that he does not need a sentence of imprisonment to keep him from committing future crimes.

On the issue general deterrence, the impact of this prosecution has already been profound. The notoriety of the sweeping arrests and even the sentences imposed on Mr. Grinberg's co-defendants all send a significant message to discourage future criminal defendants

---

[20]   It should be noted that, unlike Dr. Greenshner, Mr. Podzansky, Dr. Voytenko, and Dr. Gabinsky, Mr. Grinberg served approximately six months of his initial release period on home detention. Needless to say, Mr. Grinberg never violated any conditions of his release and his pre-trial monitoring was without incident. The defense submits that home detention was never a necessary condition of his release and served only to punish Mr. Grinberg even before he had pleaded guilty. The defense respectfully submits that the Court should consider the fact that Mr. Grinberg spent approximately half-a-year on home detention to be a *significant* factor in imposing little or no jail time as part of his sentence.

46

from engaging in such conduct.  Candidly, leniency for someone like Mr. Grinberg will send an equally important message that efforts to live a generally law-abiding, modest life; to care for your family above all else; and, when you make mistakes such as Mr. Grinberg, to accept responsibility for your actions and try to live a better life, and pay society back for your crimes, will be rewarded.  It also will send a message that criminal punishment in the federal system is administered fairly based on what you did and who you are, and not merely based on a formulaic calculation.

### c)      Protection of the Public

Mr. Grinberg is not a danger to the public.  He has no criminal history, his crime is financial in nature, and he has lived a law-abiding life but for the aberrational conduct at the center of this case.  It cannot be disputed that he does not need to be imprisoned in order to protect the public in any sense.

### d)      Correctional Treatment

Mr. Grinberg is not in need of any particular correctional treatment, such as educational and vocational training.  If he is incarcerated, however, it seems that he would benefit from participation in an alcohol and drug treatment program.  (*See* PSR § 90).

### e)      Need to Provide Restitution

The Court must also consider the need to pay restitution to victims of the offense.  18 U.S.C. § 3553(a)(7).  Restitution can provide a basis for imposing a sentence below the advisory Guidelines range.  As the Court knows, a "district court must consider the need to provide restitution because, all else being equal, the defendant will be less likely to acquire the means to comply with a restitution order while incarcerated than while working outside of prison."  *United States v. Roper*, 462 F.3d 336, 339 (4th Cir. 2006); *see also United States v. Menyweather*, 447

F.3d 625, 636 (9th Cir. 2006) ("a sentence of probation may have made Defendant better able to provide restitution to the victims of her crime").

**V.      Conclusion**

In sum, the defense requests that the Court consider the factors set forth under 18 U.S.C. § 3553(a) and impose a lenient sentence significantly below the stipulated Guidelines range and no greater than necessary to meet the goals of sentencing.  To paraphrase Your Honor's words from a recent sentencing in this case, the world will not be a better place if Mr. Grinberg goes to prison.  On the contrary, it will be a worse place for his loving family, and it will be a lost opportunity for his community to continue to experience his good works.  By fashioning a sentence that allows Mr. Grinberg to continue to provide financial and emotional support for his family and his young son, as well as his older children, the Court would achieve multiple worthy objectives.  Notably, a sentence that allowed Mr. Grinberg to resume working would be of monumental benefit to his family who have come to depend on him for financial support.  Further, and most important to Mr. Grinberg, such a sentence would minimize the harm resulting from his sentencing to particularly vulnerable members of his family, including his three-year old son.  As his wife Olga said best: "I cannot imagine life without him, even for a day."  (Letter of O. Grinberg, Ex. C).

For these reasons, we respectfully request Your Honor's mercy in imposing a sentence in this case, and permitting Mr. Grinberg to be home with his family as soon as possible.

Respectfully submitted,

/s/ Glen G. McGorty
Glen G. McGorty
Shamiso Maswoswe
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 895-4246
*Attorneys for Vladimir Grinberg*

Dated: October 22, 2013
       New York, New York